**STATE OF NEW JERSEY, Plaintiff,**

v.

**Joseph V. MORIARITY, Defendant.**

**Frank J. FARLEY, Treasurer of the County of Hudson, and County of Hudson, Petitioners,**

v.

**$168,400.97, Respondent.**

**STATE OF NEW JERSEY, by Arthur J. SILLS, Attorney General of New Jersey, Plaintiff,**

v.

**Frank J. FARLEY, Treasurer of the County of Hudson, and County of Hudson, Defendants.**

Civ. A. No. 262–64.

United States District Court
D. New Jersey.
March 31, 1967.

William F. Kelly, Jr., County Counsel, by Isadore Glauberman, Jersey City, N. J., of counsel, for petitioners.

David M. Satz, Jr., U. S. Atty., by Vincent J. Commisa, Asst. U. S. Atty., for District Director of Internal Revenue.

OPINION

COOLAHAN, District Judge:

I.

Petitioners Frank J. Farley and the County of Hudson bring this motion to remand the captioned actions, now consolidated, to the Superior Court, Law Division, of Hudson County, New Jersey. The matter has a history.

On February 13, 1964, Farley and Hudson County obtained an order to show cause in the County Court, Criminal Division, pursuant to New Jersey statutes providing for forfeiture of contraband as an aid to enforcement of the State's anti-gambling laws. N.J.S.A. 2A:152–7 to 9.[1] The complaint and af-

---

1. § 152–7: "Whenever any money, currency or cash shall be seized or captured by the police, constabulary or other officer in connection with any arrest for violation or conspiracy to violate any gambling law of this state, the said money, currency or cash shall be deemed *prima facie* to be contraband of law as a gambling device, or as part of a gambling operation, and it shall be unlawful to return the said money, currency or

cash to the person or persons claiming to own the same, or to any other person, except in the circumstances and the manner hereinafter provided."

§ 152–8: "Pending trial or ultimate disposition of the charge or charges, indictment or indictments, growing out of any arrest in connection with which any money, currency or cash was seized or captured, the same shall be accounted for and deposited with the county treasurer

fidavit in support of the order alleged that:

(1) On July 6, 1962, as the result of a raid conducted by the then Prosecutor of Hudson County and members of the Jersey City Police Department pursuant to a search warrant, the sum of $168,400.79 in United States Currency was seized by these law enforcement officers;

(2) under the prosecutor's instruction, the moneys were deposited, and still were on deposit, in the Hudson County National Bank;

(3) One Joseph V. Moriarity was subsequently indicted for violation of the gambling laws of New Jersey, and on June 3, 1963, he pleaded guilty to such violations on divers dates from December 14, 1961, through July 6, 1962, inclusive;

(4) by reason of the foregoing, the moneys were contraband and forfeited to the County;

(5) various other claims had been asserted against the money, including a United States tax lien asserted by the District Director of Internal Revenue.

The Order directed the persons named therein and all others interested in the subject currency to show cause why it should not be declared contraband and forfeited to Hudson County under the cited statute.

On February 27, 1964, the State of New Jersey sued the petitioners in Hudson County Superior Court for a judgment that the funds should escheat to the State under its statutes on abandoned property. N.J.S.A. 2A:37–29 et seq. On March 9, New Jersey's action and the forfeiture proceeding instituted by Hudson County were consolidated in the Superior Court, Law Division.

On March 18, 1964, copies of the complaint, affidavit and order to show cause in the forfeiture action were served on Frank S. Turbett, Jr., as District Director of Internal Revenue (Newark). On March 24, Turbett petitioned for removal on the ground that the matter fell within the provisions of 28 U.S.C. § 1442 (a) (1).[2] The petition recited the sev-

of the county in which said arrest occurred by and under the supervision of the prosecutor of the county."

§ 152–9: "If the trial or other ultimate disposition of such charge or charges, indictment or indictments result in a record of conviction being entered against the person or persons so arrested as aforesaid, in connection with which arrest the said money, currency or cash was seized or captured, as aforesaid, then the county treasurer may, after 6 months from the date of the record of the entry of such conviction, make application, without prior notice to the county court for an order to show cause why such money, currency or cash so seized or captured, shall not be forfeited to the sole use and gain of the county; such order to show cause shall then be served upon the person from whom said money, currency or cash was so seized or captured, in accordance with the rules of practice and procedure. Upon the return of the said order, hearing shall be conducted in summary manner, and at such hearing proof of the conviction shall be *prima facie* evidence that the money, currency or cash so seized or captured was used

in connection with the unlawful playing of any game wherein money or other thing of value is wagered or gambled; provided, however, that proof, to the satisfaction of the court, shall first be established that no action or proceeding, then pending and undetermined, has been filed in any court of competent jurisdiction against said county treasurer seeking a recovery or return of the money, currency or cash so held in custody."

2. § 1442(a) (1) provides:
"(a) A civil action or criminal prosecution commenced in a State court *against any of the following persons* may be removed by them to the [appropriate] district court of the United States * * * *:"
(1) Any officer of the United States or any agency thereof, or any person acting under him, *for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress* for the apprehension or punishment of criminals or the collection of the revenue." [Emphasis supplied.]

No other statutory authority for removal was asserted in the petition, nor has the

eral administrative steps taken by Turbett in connection with the aforementioned federal tax lien asserted against Moriarity.[3] It further averred that at all times mentioned in the complaint:

" * * * petitioner [Turbett] was acting solely under the color of his office, and all his actions in connection with the matters charged in said complaint were committed by him under color of his office, * * *."

Upon removal, the Director filed an answer and a counterclaim which prayed for judgment awarding it the currency in partial payment of the tax lien.[4]

## II.

Petitioners Farley and Hudson County contend that removal was improper and urge to remand on three grounds.

First, they contend that the currency was reduced to the possession of State law enforcement officers, who then commenced an in rem action in the appropriate State court. As a result, they argue, the State court not only assumed control over the res, but also acquired exclusive jurisdiction to hear the matter free from interference by other fora.

Second, they claim that since this is merely a forfeiture proceeding against a specific res, no relief in personam, no imposition of civil or criminal liability, is sought against the District Director. Hence, petitioners maintain that the action is not a removable civil or criminal proceeding brought "against" the Director within the meaning of Section 1442(a) (1).

Finally, petitioners stress the penal aspect of the State forfeiture proceeding designed to aid enforcement of its criminal laws. This Court is urged, as a matter of deference to New Jersey's sovereign police power, not to preempt or interfere with the administration of its criminal law and the policies embodied therein.

## III.

Petitioner's threshold point, while potentially diversionary, may be disposed of briefly. It is true that when two or more courts assert conflicting jurisdiction over property, the well-established rule is that the court first acquiring control of the res has exclusive jurisdiction to hear the matter; the other courts will abate, or at least defer, their proceedings pending the outcome of the first one. United States v. Bank of New York and Trust Co., 296 U.S. 463, 56 S.Ct. 343, 80 L.Ed. 331 (1936). Such exclusivity is especially important when problems of federalism are raised by conflict between a federal and a state jurisdiction. Ibid.

The doctrine of prior exclusive jurisdiction is inapplicable here, since there is but a single suit, not two separate in rem actions. The rule's purpose is to avoid awkward confrontation between two courts, each trying to dispose of the res pursuant to its own judgment. Thus, where only the first suit is in rem, and the second court can hear personal claims to debts or rights to share in the property without disturbing the first court's jurisdiction over the res, both actions may proceed. Kline v. Burke Construction Co., 260 U.S. 226, 232, 43 S.Ct. 79, 67 L.Ed. 226 (1922).

---

Director's counsel asserted any in his brief, although other removal provisions were discussed by way of illustration. See Note 17, infra.

3. § 6201 and § 6301 of Title 26, U.S.C. charge the Director to assess unpaid taxes and to collect them, respectively. Pursuant thereto, on May 10, 1963, Turbett made an assessment of $2,388,033.50 against Moriarity for unpaid taxes for 1961. On May 29, 1963, the lien was filed in the Hudson County Register's office and a notice of levy for delinquent

taxes due was served on the funds' custodians at the bank, and on officials of Jersey City and Hudson County. The notice of levy was renewed on October 17, 1964 and again on June 11, 1964—the last being accompanied by a "final demand for satisfaction."

4. The Court was asked to decree that the currency "is the property of the taxpayer Moriarity, and as such subject to the lien of the unpaid tax assessment * * * and that [it] be surrendered to the United States of America. * * *"

The reason for the rule is also absent in the case of removal. It is not a matter of competing suits; the question is simply whether the action begun in the State court may be removed here. Popovitch v. Kasperlik, 59 F.Supp. 993 (W.D. Pa., 1945). To the extent it may be conceptualized, while the case is here—until and unless it is remanded—there is no proceeding pending in the Superior Court with which my adjudication might conflict. In a word, it is not a matter of who should go *first*, but merely of who should go, period.

## IV.

 Petitioner's remaining points pertain to the main issue before me: whether this action is within the purview of the removal provision upon which the District Director has relied. The disruption of State jurisdiction caused by removal is a statutory privilege to be construed strictly. The burden is upon the party removing to establish his right to do so. Moreover, removal jurisdiction, when challenged by motion to remand, must be clearly demonstrated; and if there are significant doubts about its propriety, those doubts must be resolved against removal. Cameron v. Hodges, 127 U.S. 322, 8 S.Ct. 1154, 32 L.Ed. 132 (1888); John Hancock Mut. Life Insurance Co. v. United Office & Professional Workers of America, 93 F. Supp. 296 (D.N.J., 1950); Winsor v. United Air Lines, 159 F.Supp. 856 (D. Del.1958); Maurer v. International Typographical Union, 139 F.Supp. 337 (E.D.Pa., 1956); Walls v. City of New York, 156 F.Supp. 3 (D.C.1957); Breyman v. Pennsylvania, O. & D. R. Co., 38 F.2d 209 (6th Cir. 1930).[5]

If the Director cannot clearly show that this proceeding is, in some real sense, an action against him within the meaning of Section 1442(a) (1), then all else is commentary; the many concepts debated at length by both counsel including *in rem, in personam*, "constructive seizure", and proper alignment of parties, are relevant for present purposes only insofar as they bear on the ultimate issue of that Section's applicability.

For the reasons discussed below, I find that the Director has not met his burden of establishing removal jurisdiction under § 1442(a) (1), and, therefore, that the matter must be remanded to the Superior Court, Law Division, of Hudson County.

## V.

Our starting point is the removal statute itself. Its general scheme is to insure that all civil or criminal actions brought against specified classes of Federal officers and agents for their official actions may be tried in a Federal court. Of the myriad cases construing Section 1442, however, the overwhelming majority assume, with little or no comment, that the suit has been brought "against" the officer for his acts, within the meaning of the provision; these cases consider whether the acts in question were performed "under color of office" (for purposes of § 1442(a) (1)); or in the performance of "official duties" (for purposes of § 1442(a) (3)); and whether the actor was "an officer of the United States or of an agency thereof, or a person acting under him" within the statute.[6]

5. There are practical as well as statutory considerations supporting this doctrine. "No error can be predicated upon such action [remand] * * *, while, if jurisdiction be retained, error may be prosecuted upon the failure to remand and a final judgment may be reversed on this account. All doubt should therefore be resolved in favor of remand." *Breyman*, supra, 38 F.2d at 212.

6. See e.g. Sarner v. Mason, 228 F.2d 176 (3rd Cir., 1955); Goldfarb v. Muller, 181 F.Supp. 41 (D.N.J., 1959) and cases cited therein; Underhill v. Tabbutt, 62 F.Supp. 11 (E.D.Pa.1945) (Internal Revenue Officers). The Court has found one reported case of removal by a District Director under § 1442, as well as Section 1444, but the decision discusses neither the alleged basis for removal under § 1442, nor whether that ground for removal was contested. Narragansett Bay Gardens v. Grant Construction Co., 176 F.Supp. 451 (D.R.I.1959).

To determine whether the peculiar circumstances of this proceeding constitute an action "against" the District Director on account of his official actions within § 1442(a) (1) is a more difficult question, involving the perplexing intricacies of federalism frequent in removal problems.[7]

The series of enactments culminating in Section 1442(a) were initially designed to protect Federal revenue officers from prosecution or civil suit in State Court for violation of State law. See State of Tennessee v. Davis, 100 U.S. 257, 25 L.Ed. 648 (1880); Gay v. Ruff, 292 U.S. 25, 54 S.Ct. 608, 78 L.Ed. 1099 (1934).[8] Removal was restricted to cases where the officers defense was that no personal liability, civil or criminal, could be attached to his action, since he was only performing his Federal duties.

■ Subsequent amendments have, from time to time, enlarged the class of Federal officers and employees who might claim protection,[9] but these additions left unchanged the basic theory and purpose of this removal privilege: that the officer was entitled to—and the interest of national supremacy required—his protection in actions brought against him which attacked and threatened him with personal liabilities or penalties. Gay v. Ruff, supra, 292 U.S. at 32 note 8, 54 S.Ct. 608; Goldfarb v. Muller, supra, 181 F.Supp. at 47; State of Oklahoma v. Willingham, 143 F.Supp. 445, 447 (D.Okla.1956); See Hart & Wechsler, The Federal Courts and the Federal System, pp. 1147–1150.

■ The Courts have also noted that this class of removal jurisdiction is unusual, and, in the case of interference with State criminal proceedings, exceptional in nature. The balance must be kept true between construction giving full effect to its purpose, and, at the same time, the highest regard for the State's right to deal with matters properly within its domain. Goldfarb v. Muller, supra; State of Oklahoma v. Willingham, supra.

Although the traditional emphasis has been on cases where a Federal officer was threatened with monetary judgment or criminal prosecution, § 1442(a) has been successfully invoked in a few instances where the only relief sought was an injunction against proposed actions.[10] Apparently the basic theory was that if the order issued and was disobeyed, he would face contempt sanctions.

7. "That there is no other phase of American jurisprudence with so many refinements and subtleties, as relate to removal proceedings, is known by all who have to deal with them." Hagerla v. Mississippi River Power Co., 202 F. 771, 773 (E.D. Iowa, 1913).

8. The series began in 1815 with temporary statutes prompted by New England's resistance to the War of 1812. The genesis of the permanent statute is found in Section 3 of the "Force Act" of 1883, which was the national response to South Carolina's threat of "nullification", and in the wave of removal acts which followed during the Civil War.

9. In 1887 Congress added what is now paragraph (4) of § 1442(a), extending removal to officers of both houses of Congress; in 1916 the present paragraph (3) added officers of the courts of the United States; and in 1948, the basic coverage of paragraph 1 was extended to all Federal officers and their agents.

The present codification under Section 1442, is a consolidation of §§ 76 and 77 of Title 28 U.S.C. (1940 Ed.), being Section 33 of the Judicial Code of 1911, as amended.

10. See James River Apartments v. Federal Housing Administration, 136 F.Supp. 24, (D.M.D.1955) (declaratory judgment to enjoin Federal inspection of corporate records); State of Alabama ex rel. Gallion v. Rogers et al., 187 F.Supp. 848 (M.D.Ala.1960) (suit to enjoin inspecting by United States Attorney General of county voting records); And see Sarner v. Mason, supra; Pennsylvania Turnpike Comm. v. McGinnes (Case II), 179 F. Supp. 578 (E.D.Pa.1959). In *McGinnes* the Commission sought to enjoin a refund of overpaid taxes; removal was denied, *not* on the ground that such an attempted injunction against the District Director would not be within § 1442(a) (1), but on the ground that even the State Court had no jurisdiction to issue it.

**556**

■ But a suit is not automatically removable, without regard to the nature of the relief sought, merely because a Federal officer is joined and the events involved occurred while he was acting under color of his office, Gay v. Ruff, supra; Goldfarb v. Muller, supra, or because property in which the Federal officer or agency has an interest may be affected, Crivello v. Board of Adjustment, 183 F.Supp. 826 (D.N.J., 1960.) [11] Specifically, in Ford Motor Co. v. Automobile Ins. Co., 13 F.2d 415, 417 (E.D. Mich., 1926) the court stated:

"It was evidently the intent of Congress * * * to protect the federal officers mentioned by permitting them to invoke the jurisdiction of this court over proceedings brought against them by reason of their official *acts,* as distinguished from their mere *claims* of title or other legal rights * * * The sole relation of the trustee in bankruptcy to this controversy is that of a claimant of title to such proceeds adversely to the plaintiff, and whatever title such trustee

may have therein was acquired, by operation of [the Bankruptcy] law, and not by any of its own acts, from the bankrupt mortgagor. It is plain that the case is neither within the letter nor the spirit of section 33 of the Code [now § 1442] in question."

### VI.

In light of this history, the petitioner's contend that the present matter cannot in any sense be viewed as an action "against" the District Director within § 1442(a) (1), since no *in personam* relief is sought against him. They stress that this action seeks only an adjudication that the funds are contraband and forfeit by reason of their use in gambling activity, and that the Director was joined not because of any acts, but merely because of his asserted claim to a tax lien.

Whatever the outcome of the attempted forfeiture, they argue that it can result in no imposition of financial liability, let alone criminal penalty, upon Mr. Turbett.[12]

11. While the wording and punctuation of § 1442(a) (1) are not totally free of ambiguity, the legislative history and case law make clear that the phrase "*or on account of any right, title or authority claimed under any Act of Congress for * * * or the collection of the revenue,*" modifies and relates back to the referent "act", just as does the preceding phrase "under *color of such office;*" it does not define a separate basis for removing actions not stemming from the officials acts. See 1A Moore, supra, pp. 829 and 831.

12. Both the Director and the petitioners have confused somewhat the significance, for removal purposes, of the criminal aspect of New Jersey's forfeiture statute. Spagnuolo v. Bonnet, 16 N.J. 546, 557, 109 A.2d 623 (1954).

On the one hand, petitioners urge that the Federal courts have uniformly refused to permit removal of actions brought to enforce state criminal penalties. However, the cases cited in this regard declined removal attempted under 28 U.S.C. § 1441 (or its predecessors) and did so expressly because Section 1441 is keyed to the original jurisdiction of the Federal courts. See e.g. Mulligan v.

Western Union Telegraph Co., 20 F.Supp. 953 (D.N.J., 1937) The United States District Courts have no original jurisdiction to execute penal laws of the individual states. Gwin v. Breedlove, 2 How. 29, 43 U.S. 29, 11 L.Ed. 167 (1844). But this rule is inapposite to Section 1442(a) which provides an independent right of removal not contingent upon the Federal Court's jurisdiction to hear the matter directly. See 1A Moore, Federal Practice and Procedure, ¶ 0.164(1).

On the other hand, the Director's attempt to dismiss the significance of the proceeding's penal nature is also misplaced. The Director completely discounts New Jersey's sovereign interest in enforcing its penal laws on the ground that § 1442 expressly provides for the removal of "criminal prosecutions." It is clear beyond doubt that this reference means prosecutions of the Federal officers themselves. People of State of Colorado v. Maxwell, 125 F.Supp. 18 (D. Colo.1954); 1A Moore, supra, p. 825. Here there is no attempted prosecution of the Director nor an attempt to lay a foundation for one; only the convicted gambler Moriarity has been made a defendant to criminal proceedings in connection with this currency. Thus the

As for injunctive relief the petitioners disavow that as well. They maintain that since the County officials retained physical custody of the fund, institution of the forfeiture action conferred jurisdiction over the res upon the State court. Therefore, the action is allegedly a simple in rem proceeding and no court order is needed directing Turbett to relinquish or produce the res. This picture is drawn in sharp contrast to the situation which I confronted in an earlier removal proceeding presenting closely related issues and involving the same parties. See Farley v. $2,438,100.00, Civ.No.819–63 (D.N.J., 1963) unreported.[13]

Petitioner's complaint only invokes N.J.S.A. 2A:152–7 et seq., which describes an *in rem* proceeding. United States v. Bleasby, 257 F.2d 278, 280 (3rd Cir. 1962), reversing 153 F.Supp. 724 (D.N.J., 1957).[14] But this is not decisive. Unlike removal under Section 1441, the requisite jurisdictional facts for removal under Section 1442(a) need not be gleaned solely from the complaint in the State action; the removal petition and supporting affidavits may allege the basis for removal, though the complaint does not. Gay v. Ruff, supra, 292 U.S. at 34, 54 S.Ct. 608, 78 L.Ed. 1099. In general a State statute's characterization of a proceeding is not necessarily dispositive of whether a particular suit brought thereunder is in fact *in rem*,[15]

---

State's stake in its penal laws is not completely overriden by the removal statute. See p. 560, infra.

13. In Farley v. $2,438,110.00, the dominant fact, not present here, was the physical custody of the seized currency obtained at the outset by Federal rather than local officials and the subsequent covering of the monies into the United States Treasury. Therefore, the Government argued that before *in rem* jurisdiction could be obtained as a foundation for forfeiture proceedings, a judicial order directing the District Director to bring the *res* into court would have been necessary. Alternatively, it contended that while the funds remained in the Treasury, the State court could assert no *in rem* jurisdiction and could only have adjudicated *in personam* liabilities as between the claimants. Such personal actions against a District Director have been permitted where based on alleged unlawful appropriation of property to satisfy tax debts, even after the monies have been covered into the Treasury; for that reason, appropriate provisions are made in those cases for the Government to pay any personal judgment against the Director. Pennsylvania Turnpike Commission v. McGinnes, 268 F.2d 65, 67–68 (Case I) (3rd Cir. 1959); cert. denied 361 U.S. 829, 80 S.Ct. 78, 4 L.Ed.2d 71 (1959).

In refusing to remand the matter, I concluded that under either theory, although the action was denominated *in rem*, it was of necessity an essentially *in personam* action against the District Director. On the basis of this conclusion, *as well as other legal and practi-*

*cal* considerations, the matter was found removable under Section 1442(a) (1).

14. *Bleasby* was an action by the United States in the Federal District Court to establish priority of its tax lien on seized funds which had been forfeited to Bergen County, New Jersey. It was the aftermath of State v. Link, 14 N.J. 446, 102 A.2d 609 (1954) which was a forfeiture action in the State court also under N.J. S.A. 2A:152–7 to 9 to forfeit proceeds of a gambling operation. The District Director, having asserted a lien for Link's delinquent taxes, was joined in the complaint, but chose not to participate. Thereafter, the United States brought the *Bleasby* action as an independent suit. The District Court held that the Federal lien was superior to the County's right, notwithstanding the judgment of forfeiture, but the Court of Appeals reversed, holding: (1) that the State proceeding had been *in rem;* and (2) that, therefore, it was *res judicata,* in regard to the Government's claim and could not be collaterally attacked in a later independent suit. See discussion infra, p. 561.

15. The aim and effect of the action, not the statutory designation invoked by the plaintiff, determines if it is *in rem* or *in personam.* National Surety Co. v. Austin Machinery Corp., 35 F.2d 842 (6th Cir., 1929); In re Lummis' Estate, 118 F.Supp. 436, 439 (D.N.J., 1954); Beck v. Otero Irr. Dist., 50 F.2d 951 (D. Colo., 1931). Mere incantation of the statute title works no magic if the realities of the situation change the essential nature of the action. See Farley v. $2,-

much less whether it is within the ambit of a specific removal statute.[16]

 Thus, the Director's position is that whatever its formal label in the complaint, this proceeding—like the $2,438,110.00 matter, but for somewhat different reasons—is essentially *in personam*. He concedes that if the County officials had conferred jurisdiction over the *res* upon the State court, and if this were merely a suit for forfeiture, properly instituted in compliance with N.J. S.A. 2A:152-7 et seq., then this would be a true *in rem* action.[17] But he chal-

---

438,110.00, supra. Petitioners lean too heavily upon the holding in Bleasby, supra, that the New Jersey statute provides an *in rem* proceeding. That opinion did not have to consider a challenge to the State court's *in rem* jurisdiction, nor whether additional relief was sought or required.

16. Removability must be decided as an independent Federal question under the criteria provided in the pertinent removal statute, and irrespective of local law. Chicago, R. I. & P. R. Co. v. Stude, 346 U.S. 574, 74 S.Ct. 290, 98 L.Ed. 317 (1953); Crivello v. Board of Adjustment, supra, 183 F.Supp. at 827. The courts use a functional analysis to determine who are claimants and who are those resisting claims. See Mason City & Ft. D. R. Co. v. Boynton, 204 U.S. 570, 27 S.Ct. 321, 51 L.Ed. 629 (1907). These cases involve removal under § 1441, but the basic principle that local labels cannot control Federal removal is apposite.

17. The basis of a court's power to assert *in rem* jurisdiction is its control of the property on which the judgment will operate. The *res* must be actually or constructively within the reach of the Court. The Brig Ann, 13 U.S. (9 Cranch.) 289, 290, 3 L.Ed. 734 (1815); United States v. Mack, 295 U.S. 480, 55 S.Ct. 813, 79 L.Ed. 1559 (1935). Under N.J.S.A. 2A:152-7 et seq. such control is premised on custody of the fund by the County officials, who institute the action and "throw" the *res* into Court.

The Director has made a secondary argument that even if this action is considered *in rem*, he has still been made a defendant by virtue of his action in serving notice of the levy and may remove. While I indicated in Farley v. $2,438,110.00 that if the forfeiture attempt was *in rem* it would not be removable, the Director treats this dictum as merely stating a general principle not applicable where removal to the Federal courts is specifically authorized by statute. See 1A Moore, supra ¶ 0.157. But the petitioners have never denied that *in rem* actions may occasionally be removed when it is authorized by the removal provision relied upon.

The problem for the Director is that he has relied solely on § 1442(a) (1). *In rem* actions have been removed in appropriate circumstances under § 1441, Mason City & Ft. D. R. Co. v. Boynton, supra, and Section 1444 expressly provides for removal of quiet title actions against the Government under Section 2410. However, § 1444 was discussed at Bar only as an illustration of the point that *in rem* actions are not *per se* precluded from removal. It has not been relied upon for jurisdiction here.

As for § 1442(a) (1), the fact that the Director was joined as a party and the fact that a forfeiture decree will affect his claim does not make an *in rem* action one "against" him seeking personal relief. See p. 10, supra. It has become cliche that *in rem* actions are directed against the *res* itself, rather than "against" the claimants. In a more fundamental sense, however, adjudication is always *directed against* people because it is always the determination of rights and privileges or duties and liabilities. Persons, natural or artificial, have rights and duties; things do not, although they may be the objects thereof.

Hence, one must be careful to avoid the conceptual imprisonment of metaphor. The singular characteristic of *in rem* actions is simply its power to adjudicate the rights of all persons in the thing and, in that sense, it is *directed against* all persons interested in the *res*.

Only a judgment in personam imposes a personal liability, obligation, or duty to act on one person in favor of another. Hanson v. Denckla, 357 U.S. 235, 246 n. 12, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Thus, while an *in rem* claimant may be a proper party defendant, in the sense that his claim requires service or notice, Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), and that he will be precluded from collateral attack if he avoids the proceedings, *Bleasby*, supra, is bound only in regard to his rights in the *res*. It cannot be meaningfully asserted that he needs the protective device embodied in Section 1442(a) (1) as a shield from personal liability or criminal penalties.

lenges both premises, claiming that jurisdiction over the *res* was not acquired by the State court nor was the forfeiture statute complied with.

Admittedly, there was no seizure or physical custody of the monies by Federal officers which could derogate from the County's attempt to assert control. Cf. Farley v. $2,438,110.00, supra. Rather, Turbett relies on the statutory effect of his levy, which he claims gave him constructive possession or legal custody of the fund. Hence he contends that, their denials notwithstanding, the petitioners can only gain their purpose by way of affirmative relief against him, either through a court order directing relinquishment of the fund or through the substitute of personal judgment. This theory runs as follows.

 The Director's power to collect delinquent taxes presents a sweeping, summary process of self help to protect the tax lien and to place the burden of resistance on those opposing his claim. United States v. Sullivan, 333 F.2d 100, (3rd Cir., 1964). The mainsprings of this procedure, Sections 6321, 6331 and 6332, provide for the lien, the levy and a duty to surrender property levied upon, respectively.[18] His theory is based on these sections plus an additional provision, Section 2463, which deems property

"detained" under revenue law to be in the District Director's custody and subject to the exclusive jurisdiction of the Federal courts.[19]

Several cases hold that simply by serving notice of levy upon a bankrupt's debtor, the Director acquires something tantamount to constructive possession of the bankrupt's claims and rights to property, at least for purposes of Section 67 (c) of the Bankruptcy Act, under which the Director must have "possession" to defeat other priority claims.[20] Freeman v. Mayer, 253 F.2d 295 (3rd Cir., 1958) (accounts receivable); In re Cherry Valley Homes, 255 F.2d 706, (3rd Cir., 1957) (liquidated debt) cert. denied sub nom Dubois v. United States, 358 U.S. 864, 79 S.Ct. 96, 3 L.Ed.2d 97 (1958); Rosenblum v. United States, 300 F.2d 843 (1st Cir., 1962) (liquidated debt).

Moreover, this notion of "constructive seizure", in some sense analogous to physical distraint of tangible property, has been applied beyond the field of bankruptcy to the separate question of whether property has been "taken or detained" within the meaning of Section 2463 of 28 U.S.C., supra. New Hampshire Fire Insurance Co. v. Scanlon, 362 U.S. 404, 80 S.Ct. 843, 4 L.Ed.2d 826 (1959); United States v. Cameron Construction Co., 246 F.Supp. 869 (1965, S.D.N.Y.)[21]

18. "Section 6321 * * * confers a lien in favor of the United States upon all property and rights to property belonging to any person liable for any tax who neglects to pay it after demand. Section 6331 * * * authorizes the government to collect the tax by levy upon all property and rights to property belonging to the taxpayer. Section 6332 * * * provides that any person in possession of property or rights to property subject to levy upon which a levy has been made shall, on demand of the government, surrender such property [or] * * * be personally liable for the value of the property, but not exceeding the amount of the government's claim with costs and interests." In the Matter of Quakertown Shopping Center, Inc., 366 F.2d 95 (3rd Cir., 1966).

19. "All property taken or detained under any revenue law of the United States

shall not be repleviable, but shall be deemed to be in the custody of the law and subject only to the orders and decrees of the courts of the United States having jurisdiction thereof." § 2463, 28 U.S.C.

20. 11 U.S.C. § 107: "* * * liens for taxes or debts owing to the United States * * * on personal property not accompanied by possession of such property * * * shall be postponed in payment to the debts [for wages and for expenses of bankruptcy administration] specified in clauses (1) and (2) of subdivision (a) of Section 65 of this Act * * *."

21. The focal issue in New Hampshire Fire Insurance, was whether the Federal District Court had exclusive custody or merely jurisdiction of the bank deposits under § 2463. The necessary implication was

Director Turbett's use of this doctrine is twofold. First, he argues directly that since he acquired constructive possession of the fund by virtue of his levy, and since he resists the petitioner's claim, they must controvert his action and oust his custody of the fund. The effect of his levy can be undone only by a court order directing him to relinquish control of the monies and transfer custody in accordance with the mandate of the forfeiture decree. But such relief would be, to that extent, *in personam.* Atlantic Seaboard Natural Gas Co. v. Whitten, 315 Pa. 529, 173 A. 305, 93 A.L.R. 615 (1934).[22] The alternative relief of a personal liability judgment against Turbett equal to the value of the fund, (for which he would presumably seek reimbursement from the Government, see note 13 supra) would be even more clearly *in personam.*

Second, he argues indirectly that this proceeding must be *in personam because* it cannot be *in rem.* That is to say, if the Director's levy brought Section 2463 into play, then exclusive jurisdiction over the detained fund vested in this Court, and, as a corollary, the State court lacks the *in rem* jurisdiction necessary to hear the forfeiture suit. See note 17, supra. Turbett also denies the applicability of the New Jersey forfeiture statute on the grounds that certain conditions precedent, detailed below, were not met.

For all these reasons, the Director construes the instant matter as an action against him on account of his official acts and removable under the cited statute. The question thereby presented is this: Can a District Director remove a State penal forfeiture action under Section 1442(a) (1), merely because he is a levying creditor of the criminal against whom forfeiture is sought?

■ The fundamental confrontation underlying this question reflects the delicate balance of our federal system.[23] On the one hand, the Director's contentions are based on the panoply of powers with which he is clothed to ensure collection of the national revenue. On the other hand, Hudson County advances under the imposing aegis of New Jersey's sovereign power to seize and forfeit contraband in the pursuit of its criminal law and penal policies.

■ At the juncture of these two sources of power sits the $168,400.97. In the final analysis the disposition of the fund, as well as the propriety of removal, turns on this relationship between State and Federal power. Both the Director's claim to the fund and his attempted removal assume that the levy validly attached to Moriarity's property. It is the petitioners' contention that by virtue of its being contraband, the subject currency no longer belonged to Moriarity at the time of the levy; and, there-

---

that the Director's levy had at the least brought § 2463 into play.

In Cameron Construction, an assignee bank argued that there had been no seizure or detention of contested construction funds, but Judge Levitt tentatively concluded that a tax levy upon Cameron's right to the monies owed it under the contract had reduced Cameron's claim to the Director's custody and constituted "detention" under Section 2463, (citing *Rosenblum,* supra).

**22.** "There is a wide distinction between a course of judicial procedure, the object of which is to subject the *res* to the power of the state directly by the judgment or decree which is entered, and a procedure which only affects or disposes of the *res* by compelling a party to the

action to control or dispose of the *res* in accordance with the mandate or decree. The former is a proceeding *in rem;* the latter is a proceeding *in personam.*" 315 Pa. at 534, 173 A. at 307.

**23.** "And it is axiomatic that the right of the states, consistently with the Constitution and the laws of the United States, to make and enforce their own laws is equal to the right of the federal government to exert exclusive and supreme power in the field that by virtue of the Constitution belongs to it. The removal statute under consideration [a predecessor of Section 1442(a)] is to be construed with the highest regard for such equality." State of Colorado v. Symes, 285 U.S. 510, 518, 52 S.Ct. 635, 637, 76 L.Ed. 1253 (1932).

fore, that as against New Jersey's sovereign power to confiscate the money, Turbett's levy was null and void.[24]

This position is obviously critical not only to the immediate issue of removal but also the parties' ultimate rights in the currency. In short, this motion to remand presents the unusual, but occasionally encountered, situation where this Court must preview the substantive issues on the merits in order to determine the threshold question of its jurisdiction. Cf. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1945); American Hawaiian Ventures, Inc. v. Latuharhary, 257 F.Supp. 622 (D.N.J., 1966).

## VII.

The status of seized gambling monies which are claimed both by a county under N.J.S.A. 2A:152–7 and by the Director under a tax levy has been considered in two prior decisions—with opposite results. Spagnuolo v. Bonnet, 16 N.J. 546, 109 A.2d 623 (1954); United States v. Bleasby, supra.

In Spagnuolo, a final decree of forfeiture which had been obtained by the County was upheld on appeal as superior to the United States' claim under a tax

levy filed *after* the seizure of the currency, but *prior* to the condemnation proceeding and decree. In accordance with accepted theories of forfeiture, the Court ruled that under N.J.S.A. 2A:152–7 et seq., the currency was confiscated by the State and ceased being the gambler's property from the very moment of seizure. 16 N.J. at 559, 560, 109 A.2d at 631. The Court concluded that at the time of levy, title to the seized currency was in the County of Essex. "At most the federal lien could only attach to Edward Spagnuolo's *inchoate right to sue* for the return of the funds in the event of his acquittal and not to the confiscated funds themselves." Ibid. Compare Farley v. Manning, 4 N.J. 571, 73 A.2d 551 (1950).[25]

United States v. Bleasby was the suit started by the Government in the District Court for seized monies, after they had been decreed contraband and forfeited to Bergen County in an earlier State action, State v. Link. See note 14, supra. The Court viewed the controversy as essentially a problem of priority between competing lien creditors and applied the "inchoate lien" doctrine that Federal tax liens defeat liens

---

24. Both the lien and the levy require for their operation property or property rights belonging to the taxpayer. The Government's rights can rise no higher than the taxpayer's interest in the property levied upon. Central Surety & Insurance Corp. v. Martin Infante Co., 164 F.Supp. 923 (D.N.J.1958) aff'd 272 F.2d 231 (3rd Cir. 1959). Consequently, when the Director levies upon property or claims to property which do not belong to the delinquent taxpayer to satisfy his tax debts, the levy is void. Raffaele v. Granger, 196 F.2d 620 (3rd Cir. 1952); Stuart v. Willis, 244 F.2d 925, 929 (9th Cir. 1957). The recognized invalidity of a levy upon the property of one party to satisfy tax obligations of another is the basis for an exception to the general prohibition of any Court injunctions against tax collection, 26 U.S.C. § 3653 (a). Normally, one challenging the assessment or collection must acquiesce and sue for return; but if the property is not the taxpayer's, the true owner may have the levy enjoined as void. See Raffaele supra, 196 F.2d at 623.

25. *Manning* presents an instance of the United States recovering its tax lien by precisely this method of attaching the gambler's right to sue for their return upon his acquittal. The accused gambler in the *Manning* case, ironically also Mr. Moriarity, had been acquitted. Since there was no basis for a final judgment of forfeiture, the County Treasurer merely impleaded Moriarity, his sister Margaret Moriarity, and the Collector (now called District Director) of Internal Revenue. The Court upheld the finding that the money had been Moriarity's at the time of his arrest and its seizure, and that the Federal lien attached to the property to which he was now entitled. The Court made clear that it did not have to consider any possible conflict between the Government's lien and the County's right to forfeit contraband, in light of the failure to convict Moriarity and the County's express disclaimer of any interest other than that of neutral stakeholder. 4 N.J. at 576, 73 A.2d 551.

562

arising under State law which are in any way unperfected or inchoate. Under this doctrine, which is merely a variant of the old common law lien rule "first in time, first in right", Federal courts closely scrutinize State-created claims to find any possible imperfection which would permit seniority of the Federal lien.[26]

In *Bleasby* it was Bergen County's right to the monies which was found inchoate, not the Federal levy. Since proceedings for a formal decree of forfeiture can only be instituted six months after the gambler is found guilty by plea or trial, and since others can challenge forfeiture until the decree issues, the Court reasoned that the notice of levy was served prior to the "perfection" of the County's claim by the judgment of forfeiture. Hence, the Federal lien, perfected under the intervening levy, was held prior and senior to the County's interest in the fund. 153 F.Supp. at 727.

■ Moreover, the statutory construction in *Spagnuolo*, that the perfection of forfeiture "related back" to the time of seizure and defeated intervening claims, was rejected as not binding a Federal court on questions of Federal lien priority. Ibid. The priority of Federal liens, insofar as it turns on whether a competing State lien is adequately perfected, is an independent question of Federal law. United States v. Security Trust and Savings Bank, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950).

■ Nor was the fact that forfeiture involved the State's governmental powers, rather than a private individual's claim, deemed sufficient to displace the inchoate lien rule; the United States Supreme Court had already applied the inchoate lien rule to find Federal tax liens prior to claims for State and municipal taxes. Commonwealth of Massachusetts v. United States, 333 U.S. 611,

68 S.Ct. 747, 92 L.Ed. 968 (1948); United States v. City of New Britain, supra.

On review, the Court of Appeals expressed serious doubt about applying lien priority analysis to the exceptional situation of New Jersey's exercise of its sovereign power to confiscate contraband:

"True, after seizure, it still remained for the state to pursue the prescribed procedure for obtaining a formal decree of forfeiture. But this does not alter the fact that the United States has tried to impose a lien on property after it has passed into the actual possession of another government under sovereign claim of right to keep it in furtherance of the policy of its criminal laws. Thus, the United States is asserting an extraordinary power greater than and different from that involved in the cases above cited or any others upon which the United States relies." 257 F.2d at 279–280.

However, the Court of Appeals expressly left the question unresolved, after noting its difficulty, and decided that on the specific facts of the case, the Government could not collaterally attack the final judgment of forfeiture in the *Link* proceeding from which it had withdrawn. See note 14, supra.

Lengthy study of these three opinions and of the case law on forfeitures, has convinced me that I must follow the construction of the New Jersey statute given in *Spagnuolo*, both as a matter of forfeiture law and as a matter of "choice of laws" in regard to Federal tax claims.

■ The main point is simply that as the confiscating sovereign, New Jersey's position is not that of a creditor competing for his debtor's property. The theory of forfeiture of contraband is not that the criminal becomes indebted to the State or Federal government by using the property illegally. Rather, such forfeiture is a divestiture of the

**26.** "The priority of a lien created by State law depends upon "the time it attached to the property in question and became choate." United States v. City of New Britain, 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520 (1954). Liens are perfected and choate when the identity of the lien, the property it covers, and the amount all are established and nothing remains to be done. United States v. Pioneer American Insurance Co., 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963).

property without compensation which passes to the sovereign in consequence of an offense or a default. See 23 Am.Jur. Forfeiture, 624. Since no one has an absolute right to use property in ways contrary to the penal laws of the sovereign, property so used may be summarily seized, confiscated, and, in most cases, destroyed.[27]

The moment the property becomes forfeit contraband, all right, title and interest in the property held by the criminal, or subsequently gained by his creditors, assignees, or vendees, is transferred by operation of law to the sovereign. In re Henderson's Distilled Spirits, 81 U.S. (14 Wall.) 44, 20 L.Ed. 815 (1872); United States v. Stowell, 133 U.S. 1, 10 S.Ct. 244, 33 L.Ed. 555 (1890).

If the property has been forfeited and the taxpayer's rights therein extinguished prior to the tax levy, then the notion of competing liens is inapposite, since the levy cannot attach to the property at all. Therefore, the critical question is at what moment the article becomes forfeit contraband, and, in this regard, the legislative intent controls. Congress or State legislatures may decide upon what event divestiture under a forfeiture statute shall take place: whether on the commission of the offense, the seizure, or the final condemnation and decree. United States v. Grundy, 7 U.S. (3 Cranch) 337, 2 L.Ed. 459 (1806); United States v. 1960 Bags of Coffee, 12 U.S. (8 Cranch) 398, 3 L. Ed. 602 (1814); Stout v. Green, 131 F. 2d 995 (9th Cir. 1943).

The District Court's characterization of the County's claim as an inchoate lien in Bleasby is understandable, inasmuch as the New Jersey statute follows the normal pattern of requiring a final hearing and formal decree of forfeiture to perfect the County's title to the monies. However, as the New Jersey Supreme Court interpreted the act, the county treasurer, pending the hearing, is made custodial officer not of money still belonging to an individual, but of money already seized and confiscated by the State.[28] Spagnuolo, supra, 16 N.J. at 558, 109 A.2d at 629.

The Supreme Court of the United States has long since established that the need to formally "perfect" the sovereign's title to forfeited contraband, does not mean the legislature intended to leave the property interest in the offender until the decree issues. United States v. Stowell, supra; State of Texas v. Donoghue, 302 U.S. 284, 58 S.Ct. 192, 82 L.Ed. 264 (1937); and see Stout v. Green, supra; United States v. One 6.5 m.m. Mannlicher-Carcano Military Rifle, 250 F.Supp. 410 (N.D.Texas 1966). (Federal forfeiture of the assassination weapon used to kill President Kennedy).[29] The principle has also been

---

27. United States currency, of course, is the exception in that it may only be seized and confiscated, but not destroyed, by the States. 31 U.S.C. § 420 et seq.; see Ling Su Fan v. United States, 218 U.S. 302, 31 S.Ct. 21, 54 L.Ed. 1049 (1909).

28. The statutory declaration that the currency "shall be deemed *prima facie* to be contraband of law as * * * part of a gambling operation" was to establish a presumptive rule of evidence at the hearing, but it "was not and could not be intended to have the effect of leaving the legal title to such money in the gambler or player." Ibid.

29. In *Stowell*, the Court held that forfeiture of an illegal still took place the moment the offense was committed and that the transfer of the property (under the Federal revenue law both the personal property and the real estate employed were forfeit) avoided all intermediate claims even by purchaser in good faith whose claims arose prior to the final decree of condemnation: "As soon as the still was set up * * * in violation of the internal revenue laws, the forfeiture under those laws took effect, *and (though needing judicial condemnation to perfect it)* operated from that time as a statutory conveyance to the United States of all the right, title, and interest then remaining in the mortgagor, and was as valid and effectual, against all the world, as a recorded deed." 133 U.S. at 19, 10 S.Ct. at 248. [Emphasis added].

The *Stowell* rule was more recently applied to State forfeiture in the *Don-*

applied in innumerable Federal forfeitures of automobiles used to transport contraband. See e. g. United States v. One 1957 Model Tudor, 167 F.Supp. 864 (E.D.S.C., 1958).[30]

■ Director Turbett seeks to distinguish these Federal precedents on the reasonable ground that they involve Federal statutes totally distinct from the New Jersey act; but that argument only emphasizes the fact that I must look to a construction by the New Jersey courts in order to determine the legislative intent.

■ Secondly, regardless of how I might construe the effect of the instant forfeiture statute or interpret the legislative intent, this is a question which State law controls. True, the priority of Federal liens over other claims to Moriarity's property is for this Court to determine unbound by New Jersey decisions, *Bleasby,* supra. But the extent of those property rights at the time of the levy, to which the tax lien could attach is clearly a question of New Jersey law. Since the Internal Revenue Code " * * * creates no property rights but merely attaches consequences, federally defined, to rights created under state law * * * we must look first to [the taxpayer's property rights] as defined by state law." United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed. 2d 1135 (1957); United States v. Brosnan, 363 U.S. 237, 80 S.Ct. 1108, 4 L.Ed. 2d 1192 (1959); Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960).

The dichotomy is clear: Under *Bess* the Government lien attaches only to property rights created under state law. *Brosnan,* supra, 363 U.S. at 240, 80

*oghue* case, where the Referee in Bankruptcy refused Texas' request for permission to institute forfeiture proceedings in the State court against oil allegedly produced by the bankrupt in violation of Texas law. Interpreting Texas law to provide for absolute forfeiture at the moment of illegal production (or transportation), the Court held that permission should have been granted. The opinion recognized that allowing creditors of the bankrupt to allege priority claims to the oil would defeat the penal purpose of the forfeiture:

"The State's insistence is not that it is presently entitled to establish a right to forfeit oil, but that the oil became its property when produced or transported contrary to law. It seeks not to forfeit but to enforce a forfeiture that resulted, as it maintains, immediately from unlawful production or transportation. * * * The filing of the petition for reorganization in the bankruptcy court may not be held to deprive the State of opportunity in its own court to establish its claim that *through forfeiture it had already become the owner of the oil for that would be to take the State's property for the benefit of the offending company or its creditors.*" 302 U.S. at 288–289, 58 S.Ct. at 195. [Emphasis added].

And so here, where the Government is only a creditor, albeit highly preferred, and where Moriarity himself would financially benefit in direct nullification of the statute if the monies were used to help extinguish his tax obligations.

In Stout v. Green, the same rule was applied, but the Referee's refusal to allow State proceedings was affirmed on the ground that the California statute merely permitted seizure ("may be seized") of a still operated with an unexpired license, and that forfeiture under the statute only occurred upon actual seizure, which there had occurred after bankruptcy.

30. This decision is an interesting illustration in light of the matter *sub judice.* The Government libeled a car used to transport contraband liquor. A claim was filed by an individual claiming a lien under the South Carolina Code for injuries sustained in an accident involving the vehicle prior to its seizure. Although the state statute provided a perfected lien next in priority only to State motor vehicle taxes, and the Federal statute required a formal condemnation subsequent to the attachment of the lien, forfeiture was permitted. It was stipulated that the automobile was being illegally used at the time of and prior to the accident, and the Federal forfeiture was held to take place upon commission of the forbidden act. Therefore, the Court held that interest and title had been immediately transferred to the United States (citing *1960 Bags of Coffee,* supra, and *Stowell,* supra), and that this statutory transfer avoided all later liens or purchases, the requirement of subsequent formal decree notwithstanding. 167 F.Supp. at 866.

S.Ct. at 1108. "However, once the tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have consistently held determines the priority of competing liens asserted against the taxpayer's 'property' or 'rights of property'." *Aquilino*, supra, 363 U.S. at 514, 80 S.Ct. at 1280.[31]

It might be argued that the particular state law which creates or, in this case, extinguishes the pertinent property rights was designed to promote policies inapplicable to determining property rights for purposes of a Federal tax lien. But Mr. Justice Harlan has wisely emphasized that " * * * the Court in Aquilino v. United States * * * chose to accept state property law as it found it, and not to evaluate its underlying rationale in light of the needs of federal revenue collection." United States v. First National City Bank, 379 U.S. 378, 407, 85 S.Ct. 528, 543, 13 L.Ed. 2d 365 (1964) (dissent on grounds not discussed by the majority).[32]

■ In New Jersey, the levy made on seized funds at most attaches to the gambler's contingent right of action to sue for his claim to them if he is acquitted, a right quite distinct from a property interest in the monies themselves at the time of the levy. Spagnuolo, supra; cf. United States v. Hubbell, 323 F.2d 197 (5th Cir., 1963).

■ Hence, if Moriarity had no property right in the fund, Federal lien law cannot create one. Yet the Director's argument for removal jurisdiction assumes the currency itself was still Moriarity's property. If the levy merely effected an assignment of Moriarity's contingent right of action, this would not defeat the State court's *in rem* jurisdiction over the fund, even under the doctrine of "constructive seizure" by levy. Nor would the County have to seek *in personam* relief against Turbett, to gain control of the money. That is to say, should the County's claim to the monies as forfeit contraband ultimately be upheld, then, in retrospect, they were not subject to attachment by the levy, and the levy cannot serve as the linchpin for removal jurisdiction. Cf. United States v. Pagan, 140 F.Supp. 711 (S.D. N.Y., 1955); United States v. Ortiz, 140 F.Supp. 355 (S.D.N.Y., 1956).[33]

31. This division is clear in *Bess*, the main case. The United States sought to recover from a widow beneficiary under a life insurance policy the amount of taxes owed by the insured at the time of his death. Liens were perfected before death under Section 3670 of the 1939 Code (the predecessor of Section 6321). The crucial question was "whether Mr. Bess possessed in his lifetime, within the meaning of § 3670, any 'property' or 'rights to property' in the insurance policies to which a perfected lien for 1946 taxes might attach." Mr. Justice Brennan concluded that under New Jersey law, Bess had an attachable interest at death, to the extent of the then cash surrender value. However, once his property interest was identified under State law, Federal law controlled the priority of the Government lien against the beneficiary's claim; the lien was held superior, even though under New Jersey law the insured's property interest in the policy at death was *not* subject to creditor's liens enforceable against the beneficiary. 357 U.S. at 56, 78 S.Ct. 1054, 2 L.Ed.2d 1135.

32. "The application of State law in ascertaining the taxpayer's rights and of federal law in reconciling claims of competing lienors is based both upon logic and sound legal principles. This approach strikes a proper balance between the legitimate and traditional interests which the State has in creating and defining the property interest of its citizens, and the necessity for uniform administration of the federal revenue statutes." *Aquilino*, 363 U.S. at 514, 80 S.Ct. at 1281; compare note 23, supra.

33. A similar analysis was followed in these two cases, which presented factual situations even less favorable to the State. Pagan was arrested for gambling and some $3,500. in his possession was seized and held in custody by the Police Property Clerk. A month later the money was levied upon by the District Director. It was stipulated that $2,500. had been lawfully obtained, and the Government lien was held valid as to that portion. Looking to New York law, the Court then determined that Pagan had no property rights in the remaining $1,000. obtained

Admittedly, the attempted levy is a *fait accompli.* Hence, Turbett's final point is that even if the levy may prove void on the grounds that the currency was no longer Moriarity's property, the County must still seek *in personam* relief by way of attack upon the levy in order to consummate the forfeiture.

■■■ I disagree. The final adjudication of the validity of the levy does turn on the applicability of the forfeiture statute to these facts, and that issue must be disposed of by the court taking full jurisdiction of the whole matter. But as I have emphasized, the burden is on the Government to clearly establish removal jurisdiction, not the mere possibility that removal jurisdiction might be demonstrable upon the final disposition on the merits. Doubts are to be resolved against removal, especially in the delicate area of interference with State penal proceedings not involving a Federal officer as a criminal defendant.

■■■ To allow the Director to plead removal jurisdiction by virtue of a levy which, on the record before me, appears to have been void and ineffectual, would permit a bootstrap operation of ambitious proportions. Such removal would assume the very issue on the merits which the Director seems unlikely to win. Therefore, I can hardly conclude that the Director has met his burden.

## VIII.

Turbett also challenges the applicability of N.J.S.A. 2A:152–7 et seq., on the ground that several requirements have not been met. The alleged defects are threefold: (1) that there was no "raid" or "seizure" of the monies, which were merely "found"; (2) that they were not taken "in connection with an arrest"; and (3) that the monies were not accounted for and deposited with the County Treasurer under the supervision of the County Prosecutor.

■■■ These attacks are not convincing. In law, "seizure" is the act of taking possession by virtue of execution or legal authority. Bouvier's Law Dictionary, Vol. 2 at 3037. In every day jargon, police might not always use the terms *raid* or *seizure,* if they have a search warrant but the defendant is already incarcerated. However, the terms could logically be applied, as the Prosecutor of Hudson County did in his affidavit. A "raid" is not an uncommon designation for the search of a building pursuant to a warrant, even though it turns out that the building is then unoccupied. Money taken by law enforcement officers in the course of such a search is certainly "seized" as much as property "seized" under physical distraint by the Director for back taxes. In both cases, the property is taken into physical custody by irresistible force of law.

■■■ As for the contention that the property was not seized in connection with an arrest, the Director is trying to substitute the term *"simultaneous to"* for the phrase *"in connection with".* That was not the legislature's choice. Simultaneity is not required by the statute, merely an adequate relationship between the seizure and the arrest. State v. Link, supra.[34] The apparent

---

through gambling to which the tax lien could have attached. The Court relied upon Hofferman v. Simmons, 290 N.Y. 449, 49 N.E.2d 523 (1943) which had deemed the New York forfeiture statute inapplicable to gambling monies, as distinct from gambling paraphernalia; but *Hofferman* had also ruled that even apart from the effect of forfeiture, a gambler had no legal right to reclaim illegally obtained monies in a replevin action against police officers who have seized them.

34. The money was seized at Link's home, but no arrest was made, since he had already been apprehended on another charge and released on bail. On appeal, it was claimed that the money had not been seized in connection with an arrest. The argument was rejected. 14 N.J. at 452–453, 102 A.2d at 613: "simultaneous arrest and seizure are not required by the statute. [The statute] is complied with if it appears that the arrest was in connection with a violation of the gambling law * * * Here, Link's prior

purpose of this requirement is to bar precipitous seizure when there is no reasonable grounds for arrest.

 To be sure, forfeitures imposed as penalties are not favored in the law; they must be strictly construed. Lehigh Valley R. R. Co. v. Chapman, 35 N.J. 177, 171 A.2d 653 (1961); Rush v. United States, 256 F.2d 862 (10th Cir., 1958). Still, "[T]he canon in favor of strict construction is not an inexorable command to override common sense and evident statutory purpose." United States v. Brown, 333 U.S. 18, 25, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1947).[35] Thus, in rejecting the aforesaid contention that simultaneous arrest and seizure are required under the instant statute, the New Jersey Supreme Court refused overly technical construction as follows:

"The statute was enacted to discourage and prevent unlawful gambling, and the courts will not construe an enactment in such fashion as to charge the Legislature with deliberately rendering impotent the clear and unambiguously expressed intention of the whole act. * * * A statute will not be construed contrary to the over-all purpose * * * discerned from the context of the entire mandate, and restrictions or limitations not specifically contained therein will not be added by judicial interpretation, especially if they be prejudicial to the public good." State v. Link, supra, 14 N.J. at 453, 102 A.2d at 613.

 This approach also applies to the alleged defect in the disposition of the monies after seizure; the record indicates compliance with the general direction and purpose of the statute. After seizure, the monies were initially placed in a bank with the Police Director and the Police Chief of Jersey City designated as the depositors. Director Turbett emphasizes that they did not send written instruction to the bank changing the depositor designation to "Frank Farley, Treasurer of Hudson County" until almost a year later.[36] While the City officials delayed the changeover in the interim, that is understandable. In plain terms, each governmental entity involved in this matter has tried to grab the brass ring; the fund was sizeable and the City itself made initial claims to it in opposition to the County's announced attempt to seek forfeiture. Moreover the City officials apparently were unsure of their obligations under 26 U.S.C. § 6332, supra. However, the County asserted its supervision from the beginning when the monies were seized as contraband under the direction of the County prosecutor. The statutory direction of county control prior to forfeiture seems designed to defer appropriation of the monies to the general revenue pending judicial determination under the statute, and this was

---

arrest, his undisputed unlawful gambling activities and his subsequent conviction all persuade us that the seizure was 'connected' with his arrest for violation of gambling statutes. * * * Another arrest would have been mere surplusage and of no significance, the defendant already being in the custody of the court by reason of his previous apprehension."

It seems obvious that this reasoning applies a fortiori to Moriarity who was still in jail.

35. "It does not require magnified emphasis upon a single ambiguous word in order to give it a meaning contradictory to the fair import of the whole remaining language. * * * Nor does it demand that a statute be given its 'narrowest meaning'; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the law makers." Ibid.

36. The currency and gambling paraphernalia were seized on Friday, July 6, 1962, and stored in a bank vault for safekeeping over the weekend until the following Monday, when they were deposited in the special account referred to above. On July 12, the same day an indictment on the new charges was returned against Moriarity, the County Prosecutor instructed County counsel to take steps to have the County Treasurer designated depositor. The intermediate legal action between the City and the County was dismissed as moot by consent order, following the City's agreement to substitute Farley.

the apparent purpose of the deposit and the County's assertion of dominion. In any event, it is doubtful whether literal compliance with this portion of the subsection would be construed by the New Jersey courts as an intended condition precedent to forfeiture under the statute, rather than as a legislative declaration of the desirable procedure. Cf. United States v. Dotterweich, 320 U.S. 277, 278, 279, 64 S.Ct. 134, 88 L.Ed. 48 (1943), (Frankfurter, J.)

Finally, of course, there would have to be a factual determination that the monies seized with the gambling paraphernalia were sufficiently earmarked and segregated as proceeds or otherwise integral parts of the admitted gambling operation to be contraband. State v. Link, supra, 14 N.J. at 454, 102 A.2d 609; see annot. 19 A.L.R.2d 22.

In view of my decision to remand this matter, it is not necessary for me to finally adjudicate these contentions and issues, some of which may require a fuller factual hearing before final determination. Since the Director has the burden of establishing removal jurisdiction and the assumptions on which it is based, it suffices to note my very strong doubts that these attacks on the invocation of N.J.S.A. 2A:152-7 et seq. have any merit. If the Director fails to show substantial likelihood that noncompliance with the statute will be found, doubts about removal theories premised in part on such non-compliance must be resolved against him. If the statute is deemed applicable by the forfeiture tribunal, Moriarity having pleaded guilty, then the foregoing analysis of the effect of forfeiture indicates the money was contraband and that Moriarity had no property right in it to which the tax levy could attach.

 . For all the above discussed reasons, I find that the respondent District Director has not established this Court's removal jurisdiction under 28 U.S.C. § 1442(a) (1) and, therefore, that this matter must be remanded.

Let an appropriate order be submitted by the petitioners.